

FILED

09/06/2017, 9:29 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Joanna L. Green
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jodi Kathryn Stein
Ellen Hope Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Larry W. Newton, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

September 6, 2017

Court of Appeals Case No.
18A05-1612-PC-2817

Appeal from the Delaware Circuit
Court

The Honorable Linda Ralu Wolf,
Judge

Trial Court Cause No.
18D01-9410-CF-46

**May, Judge.**

[1] In 1994, seventeen-year-old Larry W. Newton, Jr. ("Newton") murdered nineteen-year-old Christopher Coyle ("Coyle"). Newton pled guilty to the murder and, per the terms of a plea agreement, the trial court sentenced Newton to life without the possibility of parole ("LWOP"). Newton now

appeals the denial of his successive petition for post-conviction relief. Newton raises several arguments on appeal, which we consolidate and restate as:

> (1) Whether Newton's sentence of LWOP violates the Eighth Amendment's prohibition against cruel and unusual punishment; and

> (2) Whether Newton waived his right to challenge his sentence under the Eighth Amendment when he entered into a plea bargain agreeing to serve LWOP.

We affirm.[1]

# Facts and Procedural History

On September 23, 1994, Newton and a fellow member of the "Fly Gang," (Plea Hr'g Tr. at 78),[2] Duane Turner ("Duane"), attended a party on the Ball State University campus. Duane was kicked out of the party. The following night, Newton, Duane, and other members of the gang were gathered in a graveyard discussing the previous night's events. Newton decided he "felt like killing somebody" in retaliation for Duane being kicked out of the party, (*id.* at 80),

---

[1] We held oral argument on this case on July 10, 2017, in the Court of Appeals Courtroom. We thank counsel for their oral advocacy.

[2] This appeal concerns Newton's second, or successive, petition for post-conviction relief. We refer to the transcript from the Change of Plea Hearing held October 16, 1995, as "Plea Hr'g Tr." We refer to the transcript from the December 29, 1995, Sentencing Hearing as "Sent. Tr." We refer to the transcript from the July 7, 2016, hearing on Newton's successive petition for post-conviction relief as "Tr." We refer to all appendices from Newton's former post-conviction relief appeal, Appellate Case No. 18S00-0804-CR-00151, as "CR-151 App." Finally, we refer to all appendices from Newton's current successive post-conviction appeal, Appellate Case No. 18A05-1612-PC-2817, as "PC-2817 App."

and said he was "hyped and wanted to get revenge." (*Id.*) Newton borrowed a handgun from another gang member, Scott Turner ("Scott"). Duane agreed to participate in Newton's idea, and their friend Chad Wright ("Wright") agreed to drive them.

[4] In the early morning hours of Sunday, September 25, 1994, Wright drove Newton and Duane to Ball State's campus. Newton and Duane spotted Coyle, a Ball State student whom they did not know, walking alone near the university's campus. Newton and Duane ran up to Coyle and forced Coyle into Wright's car. Once Coyle was in the car, Newton and Duane attempted to rob him, but he had no money. They took Coyle to an alley where Newton shot Coyle in the back of the head, killing him.[3] Police found Coyle's body at approximately 2:46 A.M. on Sunday, September 25, 1994, in the alley where he was shot.

[5] After the murder, Newton and the others retreated to a friend's house where Scott was staying. Newton was "smiling" and told Scott he "shot someone." (*Id.* at 82.) Newton returned the gun to Scott and requested he destroy it. Scott attempted to destroy the gun by throwing the grips out of a car window, throwing some parts of the gun into the White River, and putting the remainder

---

[3] After Newton shot Coyle in the back of the head, Duane also shot Coyle in the head. Duane was charged and proceeded to a jury trial on the same charges filed against Newton. Duane was convicted of murder, Class B felony criminal confinement, and Class A felony attempted robbery resulting in serious bodily injury, and the trial court sentenced Duane to LWOP for murder. Our Indiana Supreme Court affirmed Duane's convictions. *Turner v. State*, 682 N.E.2d 491 (Ind. 1997).

of the gun in the Prairie Creek Reservoir. A few days later, Newton confessed to the murder.

[6] On October 19, 1994, the State charged Newton under Cause Number 18D01-9410-CF-46 with murder, a felony,[4] Class B felony criminal confinement,[5] Class A felony conspiracy to commit robbery resulting in serious bodily injury,[6] and Class A felony attempted robbery resulting in seriously bodily injury.[7] The State requested the court impose the death penalty based on the facts Newton intentionally killed Coyle: (1) "while committing or attempting to commit robbery against [Coyle]," and (2) "while committing or attempting to commit criminal gang activity by intentionally actively participating in a criminal gang." (CR-151 App. Vol. 1 at 46.)

[7] Initially, Newton pled not guilty. In November 1994, Newton filed a petition alleging he was "mentally retarded" as defined by Indiana Code section 35-36-9-2 (1994) and requested the court dismiss the death penalty against him. Additionally, Newton filed notice of his intent to use the defense of mental disease or defect under Indiana Code section 35-41-3-6 (1984). Three court-appointed mental health experts and a neuropsychologist examined Newton. Based on their reports, in September 1995, the court determined Newton was

---

[4] Ind. Code § 35-42-1-1(1) (1993).

[5] Ind. Code § 35-42-3-3(1) (1989).

[6] Ind. Code §§ 35-42-5-1(1) (1984); 35-41-5-2 (1977).

[7] Ind. Code §§ 35-42-5-1(1) (1984); 35-41-5-1 (1977).

"not a mentally retarded individual" under the statute, (CR-151 App. Vol. 4 at 773-76), and denied Newton's request to dismiss the death penalty allegation.

[8] In October 1995, Newton's counsel negotiated a plea agreement with the State. The terms of the plea agreement provided Newton would plead guilty to murder and serve a sentence of LWOP therefor, in exchange for the State's dismissal of its request Newton receive the death penalty. The agreement further provided Newton's sentences for confinement, conspiracy to commit robbery, and attempted robbery would be determined by the trial court.

[9] On October 16, 1995, the court held a hearing on Newton's change of plea. The court questioned Newton thoroughly to ensure his understanding of the plea agreement, noted it would order a presentence investigation report, and "only after receiving and reviewing that report" would the court "decide whether or not to accept the plea agreement." (Plea Hr'g Tr. at 40.)

[10] On December 29, 1995, the court held a sentencing hearing. The court heard testimony from Newton's mother Peggy Newton, Scott, and Detective Paul Singleton of the Muncie Police Department. The court also heard statements from members of Coyle's family and Erica Miller, Coyle's girlfriend. The court heard counsels' arguments on mitigating and aggravating circumstances. The court made findings regarding mitigating and aggravating factors before sentencing Newton. The court accepted the plea agreement and, in accordance with that agreement, sentenced Newton to LWOP for Coyle's murder. The trial court sentenced Newton to forty-five years for Class A felony conspiracy to

commit robbery and twenty years for Class B felony criminal confinement.[8] The court ordered those sentences served consecutive to each other and to the LWOP sentence. Newton did not, at that time, file a direct appeal from his sentencing.

[11] In October 2001, Newton filed a petition for post-conviction relief alleging ineffective assistance of counsel and involuntary guilty plea. The post-conviction court held a hearing on July 18, 2002, and denied Newton relief on October 21, 2002. Newton did not appeal that decision.

[12] On April 9, 2007, Newton filed a "Verified Petition for Permission to File a Belated Notice of Appeal," (CR-151 App. Vol. 6 at 1134) ("First Belated Petition"), under Indiana Post-Conviction Rule 2 from the trial court's December 29, 1995, sentencing order. The trial court appointed counsel to represent Newton. On September 6, 2007, the court held a hearing on Newton's First Belated Petition, and on October 5, 2007, the court denied the petition. Newton did not perfect an appeal of the denial of that petition within thirty days as required by Indiana Appellate Rule 9(A)(1).

[13] Then, on November 15, 2007, Newton filed a "Request for Permission to File a Belated Appeal," (*id.* at 1182) ("Second Belated Petition"), from the court's October 5 denial of his First Belated Petition, stating "it was through

---

[8] The court determined the attempted robbery charge "merged" with the conspiracy to commit robbery conviction, and it dismissed the attempted robbery charge. (Sent. Tr. at 127.)

inadvertence and mistake of this Public Defender that a Notice of Appeal was not filed in a timely manner." (*Id*.) The trial court initially granted Newton's Second Belated Petition, and on December 3, 2007, Newton filed that notice of appeal. But then, on December 10, 2007, the trial court *sua sponte* entered an order setting aside its order granting Newton's Second Belated Petition, finding it lacked authority under Post Conviction Rule 2 to grant the Second Belated Petition. Newton proceeded with appeal of the trial court's December 10 denial of his Second Belated Petition from the trial court's October 5 denial of First Belated Petition. Our Indiana Supreme Court affirmed the trial court's order setting aside its grant of Newton's Second Belated Petition. *Newton v. State*, 894 N.E.2d 192 (Ind. 2008).

[14] On June 28, 2013, Newton filed, *pro se*, a petition for permission to file a Successive Verified Petition for Post-Conviction Relief in the Indiana Court of Appeals under Cause Number 18A02-1307-SP-580. (PC-2817 App. Vol. 2 at 32-33.) Newton claimed his LWOP sentence had become unconstitutional under the changed legal landscape regarding sentences of LWOP for juveniles, and thus his sentence should be modified. On July 22, 2013, our Court granted permission for Newton to file his successive petition for post-conviction relief.

[15] Newton filed his successive petition in the trial court on September 11, 2013. The State filed its answer on September 17, 2013. Indiana Deputy Public Defender Joanna Green entered her appearance on Newton's behalf on September 19, 2013, and she notified the court of her inability to investigate Newton's case at that time due to her caseload. Newton requested the court

stay all proceedings until counsel was ready to proceed. The court granted Newton's request to stay the proceedings.

On February 1, 2016, Newton, via counsel, filed an amended successive petition for post-conviction relief. The court held a hearing on Newton's petition on July 7, 2016. At the hearing, Newton's counsel argued Newton "has matured and shown moral growth" while in prison, (Tr. at 4), and offered evidence of Newton's extensive participation in a Shakespeare for Offenders program during his time in prison. On December 7, 2016, the trial court denied Newton's successive request for post-conviction relief.

# Discussion and Decision

"The petitioner in a post-conviction proceeding bears the burden of establishing grounds for relief by a preponderance of the evidence." *Humphrey v. State,* 73 N.E.3d 677, 681 (Ind. 2017). "When appealing the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment." *Id.* To prevail on appeal from the denial of post-conviction relief, the petitioner must show the evidence leads "unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court." *Id.* We do not defer to the post-conviction court's legal conclusions, but "a post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made." *Id.* at 682.

Post-conviction proceedings do not afford defendants the opportunity for a "super-appeal." *Conner v. State*, 711 N.E.2d 1238, 1244 (Ind. 1999), *reh'g denied*, *cert. denied sub nom Conner v. Indiana*, 531 U.S. 829 (2000). "Rather, post-conviction proceedings provide defendants the opportunity to raise issues that were not known at the time of the original trial or that were not available to the defendant on direct appeal." *Id.* They are not a substitute for direct appeals, but "provide a narrow remedy for subsequent collateral challenges to convictions." *Id.* All grounds for relief available to a petitioner must be raised in his original petition. Ind. Post-Conviction R. 1(8). "Claims that could have been, but were not, raised in earlier proceedings and otherwise were not properly preserved are procedurally defaulted; we do not authorize the filing of successive petitions raising forfeited claims." *Matheney v. State*, 834 N.E.2d 658, 662 (Ind. 2005). "Claims that have already been decided adversely are barred from re-litigation in successive post-conviction proceedings by the doctrine of *res judicata*." *Id.*

## I. Waiver of Eighth Amendment Claim

We begin with the post-conviction court's finding, and the State's argument, that Newton waived his right to challenge the constitutionality of his LWOP sentence when he voluntarily entered a plea agreement that required he serve a sentence of LWOP. Newton claims he could not have waived a right "that was

unknown or unavailable to him at the time he pled guilty."[9] (Appellant's Br. at 17.)

[20] Newton agreed to plead guilty and serve a sentence of LWOP in exchange for the State agreeing to dismiss its request for the death penalty. In challenging the validity of this plea agreement, Newton argues, because subsequent statutory revision and case law rendered the death penalty an illegal sentence for juvenile offenders, he did not receive any benefit from his plea bargain. *Compare* Ind. Code § 35-50-2-3(b)(1) (1995) *with* Ind. Code § 35-50-2-3(b)(1) (2002) (changing the statutorily-required age from sixteen to eighteen for death sentence to be available as punishment); *see also Roper v. Simmons,* 543 U.S. 551, 125 S. Ct. 1183 (2005) (rendering death penalty unconstitutional punishment for juveniles). We are unpersuaded by Newton's argument.

[21] In *Stites v. State,* our Indiana Supreme Court held "a defendant may not enter a plea agreement calling for an illegal sentence, benefit from that sentence, and

---

[9] Other courts have addressed the issue of waiver of this particular constitutional claim and have reached varying results. Some held the plea agreement did not waive the constitutional claim. *See, e.g., Moore v. State*, 749 S.E.2d 660, 661 (Ga. 2013) (holding defendant, who avoided death sentence by voluntarily entering into plea agreement in which he consented to imposition of LWOP and waived all rights to post-conviction review, did not "waive or 'bargain away' right to challenge an illegal and void sentence"); *Malvo v. Mathena*, __ F. Supp. 3d __, No. 2:13-CV-375, 2017 WL 2462188, at *11 (E.D. Va. May 26, 2017) (concluding, in order to find petitioner, a juvenile offender, knowingly and intelligently waived his right to challenge his LWOP sentence, the court "would have to find Petitioner implicitly or indirectly waived the Eighth Amendment right announced in *Miller*" when he agreed to be sentenced to LWOP, which was "not likely" "given the fact petitioner was sentenced more than eight years before *Miller*"), *appeal docketed,* No. 17-6758 (4th Cir. Jun 14, 2017). Others held the plea agreement waived the constitutional claim. *See, e.g., Dingle v. Stevenson*, 840 F.3d 171, 175 (4th Cir. 2016) (juvenile defendant who chose to plead guilty and serve life with parole in order to avoid death penalty or LWOP received the "present benefit" under the law as it existed at the time, and *Roper* did not undermine the voluntariness of his plea), *cert. denied*, 137 S. Ct. 2094, 197 L. Ed.2d 897 (2017).

then later complain that it was an illegal sentence." 829 N.E.2d 527, 529 (Ind. 2005), *reh'g denied.* Newton claims the *Stites* rationale does not apply to him because he "did not receive a significant benefit" through his plea bargain by "avoiding . . . a sentence he would have been ineligible for seven years later." (Appellant's Br. at 17.) However, since *Stites,* we have made clear a petitioner receives the benefit of a plea agreement *at the time* the agreement was entered, and cannot later challenge the sentence as illegal, despite later case law that would have rendered the sentence illegal. *See Fowler v. State,* 977 N.E.2d 464, 468 (Ind. Ct. App. 2012), *aff'd on reh'g*, 981 N.E.2d 623 (Ind. Ct. App. 2013), *trans. denied.*

[22] In *Fowler*, the State charged Fowler with felony unlawful possession of a firearm by a serious violent felon along with a host of other charges. *Id*. at 465-66. Fowler entered into a plea agreement wherein he agreed to plead guilty to the unlawful possession of a firearm charge and a habitual offender enhancement, and in exchange, the State dismissed the other charges and Fowler's sentence was capped at thirty-five years. *Id*. at 466. The trial court ultimately sentenced Fowler to thirty years: fifteen for the firearm charge and fifteen for the habitual offender enhancement. *Id*. Subsequently, our Indiana Supreme Court held "a defendant convicted of unlawful possession of a firearm by a serious violent felon may not have his or her sentence enhanced under the general habitual offender statute by proof of the same felony used to establish that the defendant was a 'serious violent felon.'" *Mills v. State*, 868 N.E.2d 446,

450 (Ind. 2007). Fowler then filed a petition for post-conviction relief asserting his sentence was illegal. That petition was denied.

[23] In our opinion affirming the denial of Fowler's petition for post-conviction relief, we cited *Stites* and held that, even if Fowler's sentence would have been illegal under the *Mills* rule, Fowler forfeited the right to challenge it by entering into his plea agreement. *Id*. at 466-467. In so holding, "we decline[d] Fowler's invitation to measure Fowler's 'benefit' at a time after he entered into the plea agreement," *id.* at 467, because at the time he entered into the agreement, "he faced as many as fifty-six years and he bargained for a maximum of thirty-five." *Id.* In support of our position, we cited the general principle of contract law that "all applicable law in force *when the agreement is made* impliedly forms a part of the agreement without any statement to that effect." *Id*. at 468 (citing *Ethyl Corp. v. Forcum-Lannon Assocs., Inc.*, 433 N.E.2d 1214, 1220 (Ind. Ct. App. 1982)) (emphasis added). We thus concluded that, because Fowler received a benefit at the time he entered into the plea bargain, he could not later challenge the sentence as illegal. *Id.*

[24] The same principle applies here. At the time Newton entered into the plea agreement, Newton could have been sentenced to death. *See* Ind. Code § 35-50-2-3(b)(1) (1994). Newton received a very significant benefit because the State dismissed its request for the death penalty. Put differently, Newton gained the certainty, *at that time,* of knowing he would not be put to death. Although this plea bargain would have been illusory under the subsequent version of section 35-50-2-3, this fact is of no consequence because Newton received the benefit of

his bargain at the time he entered into the plea agreement. *See Fowler*, 977 N.E.2d at 468 ("As Fowler received a benefit at the time he entered into his plea bargain, he may not now challenge the sentence as illegal.").

Nonetheless, we acknowledge "Newton's sentence has never received appellate scrutiny," *see Newton*, 894 N.E.2d at 195 (Rucker, J., dissenting), and "the appellate rules and legal neglect have conspired" against Newton obtaining such review. *Id*. at 193 (Shepard, C.J., concurring). Given the important interest at stake here—the possibility that Newton's sentence of LWOP violates the Eighth Amendment's prohibition of cruel and unusual punishment—we choose to exercise our appellate discretion and address the merits of the issue. *See In re D.J. v. Indiana Dep't of Child Servs.*, 68 N.E.3d 574, 579 (Ind. 2017) (reviewing courts have discretionary authority over the appellate rules, which "allows us to achieve our preference for deciding cases on their merits rather than dismissing them on procedural grounds") (internal quotations omitted).

## II.  Constitutionality of Newton's LWOP Sentence

"The Eighth Amendment's prohibition of cruel and unusual punishment 'guarantees individuals the right not to be subjected to excessive sanctions.'" *Miller v. Alabama*, 567 U.S. 460, 469, 132 S. Ct. 2455, 2463, (2012) (quoting *Roper*, 543 U.S. at 560, 125 S. Ct. at 1190). That right "flows from the basic precept of justice that punishment for crime should be graduated and proportioned to both the offender and the offense." *Id*.

> In order to determine whether a punishment is cruel and unusual, the [United States] Supreme Court "look[s] beyond historical conceptions to the evolving standards of decency that mark the progress of a maturing society." The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. The applicability of what is cruel and unusual punishment changes "as the basic mores of society change."

*Conley v. State*, 972 N.E.2d 864, 877 (Ind. 2012) (internal citations omitted).

[27] "[C]hildren are constitutionally different from adults for purposes of sentencing," and "these differences result from children's diminished culpability and greater prospects of reform." *Montgomery v. Louisiana*, 136 S. Ct. 718, 733 (2016). Therefore, it is cruel and unusual punishment for an individual under the age of eighteen to be sentenced to LWOP for a non-homicide crime. *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010)). In addition, sentencing schemes that impose mandatory LWOP on juveniles are unconstitutional under the Eighth Amendment. *Miller,* 567 U.S. at 487, 132 S. Ct. at 2473; *Conley*, 972 N.E.2d at 877. Finally, under the Eighth Amendment, before sentencing a juvenile to LWOP, the sentencing judge must take into account "how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." *Montgomery*, 136 S. Ct. at 734. The Supreme Court created these special rules for juveniles because a sentence of LWOP is a disproportionate sentence for "all but the rarest of juvenile homicide offenders,"

those whose crimes reflect "irreparable corruption" rather than the "unfortunate yet transient immaturity of youth." *Id*.

[28] Newton argues his LWOP sentence violates the Eighth Amendment of the United States Constitution under the recent United States Supreme Court decisions of *Miller* and *Montgomery*. The State argues the holdings of *Miller* and *Montgomery* do not apply to Newton's sentence because Newton agreed to serve a LWOP sentence under the terms of a plea agreement, and thus his sentence does not fall within the meaning of "mandatory" in *Miller* and *Montgomery*. To decide these issues, we begin with a detailed review of those cases.

### 1) *Miller* and *Montgomery*

[29] In *Miller*, the U.S. Supreme Court held statutory sentencing schemes requiring mandatory life without parole for juvenile homicide offenders violate the Eighth Amendment's prohibition on "cruel and unusual punishments." 567 U.S. at 465, 132 S. Ct. at 2460. There, the Court addressed two cases, one from Alabama and one from Arkansas, each involving a fourteen-year-old convicted of murder and sentenced to a mandatory term of LWOP. *Id*. In the Arkansas case, the petitioner, Jackson, was involved in a video store robbery that resulted in one of his co-conspirators shooting and killing the video store clerk. *Id*. at 465-66, 132 S. Ct. at 2461. In the Alabama case, the petitioner, Miller, along with his friend, beat Miller's neighbor to death and set fire to his trailer after drinking and using drugs. *Id.* at 468, 132 S. Ct. at 2462. Both Miller and Jackson were tried and convicted by juries, and their respective trial courts

imposed statutorily mandated sentences of LWOP. Both states' Supreme Courts upheld the LWOP sentences.

[30] The U.S. Supreme Court granted certiorari and declared mandatory LWOP sentencing schemes are unconstitutional under the Eighth Amendment. In so holding, the Court rested its analysis on a line of decisions that included *Roper*, 543 U.S. 551, 125 S. Ct. 1183 (holding it was cruel and unusual punishment to sentence an individual under the age of eighteen to death), and *Graham*, 560 U.S. 48, 130 S. Ct. 2011 (declaring it is cruel and unusual punishment to sentence an individual under the age of eighteen to LWOP for a non-homicide crime).

[31] The Court noted *Roper* and *Graham* collectively established that "children are constitutionally different from adults for purposes of sentencing," 567 U.S. at 471, 132 S. Ct. at 2464, and that "[b]ecause juveniles have diminished culpability and greater prospects for reform, . . . they are less deserving of the most severe punishments." *Id*. The Court then noted its reliance on not only common sense, but "developments in psychology science and brain science," *id*., to support its opinion that three fundamental differences exist between juvenile and adult minds: children's "transient rashness, proclivity for risk, and inability to assess consequences." *Id.* The Court noted these "distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Id*. at 472, 132 S. Ct. at 2465. "Because the heart of the retribution

rationale relates to an offender's blameworthiness," the Court reasoned, "the case for retribution is not as strong with a minor as an adult." *Id.*

[32] The Court then applied these previously-adopted rationales to demonstrate the "flaws of imposing mandatory LWOP sentences on juvenile homicide offenders." *Id.* at 476, 132 S. Ct. at 2467. The Court stated:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys. And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.

*Id.* at 477-78, 132 S. Ct. at 2468 (internal citations omitted).

[33] Applying this reasoning to the two cases before it, the Court noted both Jackson and Miller were only fourteen years old and both had troubled childhoods, which were facts that "[a]t the least, a sentencer should look at" before imposing a LWOP sentence. *Id.* at 478, 132 S. Ct. at 2469. The Court reasoned: "By making youth (and all that accompanies it) irrelevant to

imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* at 479, 132 S. Ct. at 2479. In remanding both cases, the Court noted, "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles," and concluded the mandatory sentencing schemes therefore "violate[d] [that] principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment." *Id*. at 489, 132 S. Ct. at 2475.

[34] Last year, in *Montgomery*, the U.S. Supreme Court held the rule announced in *Miller*—that a sentencing scheme mandating LWOP for juvenile homicide offenders violates the Eighth Amendment—is a substantive rule of constitutional law, and thus is retroactive. 136 S. Ct. at 736. In *Montgomery*, the petitioner, Montgomery, was seventeen years old in 1963 when he killed a deputy sheriff. *Id*. at 725. Montgomery was tried and found "guilty without capital punishment" by a jury. *Id*. Under Louisiana law, the verdict required the trial court to impose an LWOP sentence, which it so imposed. *Id*. at 726. After the U.S. Supreme Court issued its *Miller* decision, Montgomery sought review of his mandatory LWOP sentence by filing a motion to correct an illegal sentence. *Id*. The trial court denied Montgomery's motion, finding "*Miller* is not retroactive on collateral review." *Id.*

[35] In its review of the trial court's decision, the U.S. Supreme Court determined *Miller*'s prohibition on mandatory LWOP announced a new substantive rule that must be retroactive under the federal Constitution. *Id*. at 732. The Court noted that, although *Miller*'s holding has a "procedural component," *id.* at 734,

"*Miller* . . . did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole." *Id.*

> [I]t established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "unfortunate yet transient immaturity."

*Id.* (internal citations omitted). The Court thus reasoned, because *Miller* determined that sentencing a child to LWOP is excessive "for all but the rare juvenile offender whose crime reflects irreparable corruption," *id., Miller* established a substantive rule because it established "a *class* of defendants because of their status," *id.* (emphasis added), for whom LWOP sentences were unconstitutional: "juvenile offenders whose crimes reflect the transient immaturity of youth." *Id.* The Court explained, "when the Constitution prohibits a particular form of punishment for a class of persons, an affected prisoner receives a procedure through which he can show that he belongs to a protected class." *Id.* at 735. The Court therefore reasoned, "The hearing does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity." *Id.*

[36] Applying this framework to Montgomery's circumstances, the Court noted Montgomery's submission of his "evolution from a troubled, misguided youth to a model member of the prison community." *Id.* The Court concluded

"prisoners like Montgomery must be given the opportunity to show their crime did not reflect irreparable corruption; and if it did not, their hope for some years of life outside prison walls must be restored." *Id.*

## 2) Indiana's Application of *Miller* Principles

[37] Our Indiana Supreme Court applied *Miller* when addressing the constitutional implications of LWOP for a seventeen-year-old convicted of murder in *Conley,* 972 N.E.2d at 864.[10]  In *Conley*, seventeen-and-a-half-year-old Conley brutally murdered his ten-year old brother while babysitting him.  *Id*. at 869.  Conley

---

[10] We also note in 2014, our Indiana Supreme Court discussed *Miller* in the context of inappropriate sentencing under Indiana Appellate Rule 7(B) in two companion cases: *Brown v. State*, 10 N.E.3d 1 (Ind. 2014), and *Fuller v. State,* 9 N.E.3d 653 (Ind. 2014).  For reasons set forth below, we will not undertake to analyze Newton's sentence under Indiana Appellate Rule 7(B).  *See infra* n.13.  However, *Brown* and *Fuller* bear mentioning because, in those cases, our Indiana Supreme Court applied the *Miller* reasoning.

*Brown* and *Fuller* arose out of an incident in which three teenagers, sixteen-year-old Brown, fifteen-year-old Fuller, and eighteen-year-old Smith murdered Stephen Streeter and his girlfriend, Keya Prince, while robbing the couple in their home.  The trial court sentenced both Brown and Fuller to two maximum terms of sixty-five years (one for each murder) and to a maximum term of twenty years for Class B felony robbery.  The court ordered the sentences served consecutively, resulting in an aggregate 150-year sentence for both Brown and Fuller.  *Brown*, 10 N.E.3d at 3; *Fuller*, 9 N.E.3d at 655.

In reducing both of their sentences, our Indiana Supreme Court gave significant weight to Brown's young age of sixteen and Fuller's young age of fifteen.  Citing *Miller*'s holding that mandatory LWOP sentences for those under eighteen are unconstitutional, the Court noted *Miller*'s "general recognition that juveniles are less culpable than adults and therefore are less deserving of the most severe punishments."  10 N.E.3d at 7; 9 N.E.3d at 657.  The Court then reasoned, "similar to a life without parole sentence, a 150-year sentence forswears altogether the rehabilitative ideal."  10 N.E.3d at 8; 9 N.E.3d at 658.  The Court also found a "particularly important" factor in that while Brown was an accomplice, Fuller was "one of the actual shooters."  9 N.E.3d at 658.  The Court reduced Brown's murder sentences to sixty years for each murder, to be served concurrent to each other and consecutive with the twenty-year sentence for robbery, resulting in an aggregate sentence of eighty years.  10 N.E.3d at 8.  The Court reduced Fuller's sentence to the maximum sixty-five years for each murder, to be served concurrent to each other and consecutive to the twenty-year sentence for robbery, for an aggregate sentence of eighty-five years.  9 N.E.3d at 659.

pleaded guilty to murder without a plea agreement, and following a sentencing hearing, the trial court sentenced Conley to LWOP.

[38] On direct appeal, the Indiana Supreme Court affirmed Conley's LWOP sentence, holding a sentence of LWOP for a juvenile does not violate the Eighth Amendment's prohibition of cruel and unusual punishment.[11] *Id.* at 879. In so holding, the Court noted the U.S. Supreme Court's explicit statement in *Roper*, that while sentencing someone under the age of eighteen to death was cruel and unusual punishment, "life without parole was still a viable sentence for juveniles, noting the LWOP sentence was a severe enough sanction to not need the death penalty for juveniles." *Id.* (citing *Roper*, 543 U.S. at 572, 125 S. Ct. at 1183). The Court reasoned, "the implication of *Roper* then, is that a sentence of life without parole for a juvenile convicted of homicide is constitutional." *Id.*

[39] The Court "underscored" its position that the *Miller* decision "deal[t] solely with the issue of mandatory sentencing schemes requiring life-without-parole for juveniles," *id.* at 879, and that, in fact, the U.S. Supreme Court specifically noted "Indiana was one of fifteen states where life without parole was discretionary." *Id.* Thus, the Court reasoned, its holding that an LWOP sentence in Indiana is not unconstitutional "was not altered by *Miller*." *Id.*

---

[11] In *Conley*, our Indiana Supreme Court also found Conley's LWOP sentence constitutional under the Indiana Constitution. 972 N.E.2d at 880.

### 3) Constitutionality of Newton's LWOP Sentence under *Miller* and *Montgomery*

[40] Before we can undertake a discussion of whether Newton's LWOP sentence is constitutional under *Miller* and *Montgomery*, we note the parties initially dispute whether *Miller* and *Montgomery* are even applicable to Newton's particular circumstance. Newton characterizes his LWOP sentence as "mandatory," (Appellant's Br. at 15), and thus argues it is unconstitutional under *Miller* and *Montgomery*. The State argues, and the successive post-conviction court concluded, "the holding in *Miller* does not apply to [Newton's] LWOP sentence" because he "was not sentenced under a mandatory sentencing scheme nor even a discretionary one[.]" (Appellee's Br. at 26.)

[41] Thus, we must first determine whether the scope of *Miller* and *Montgomery* extends to this case. That is, whether the rule established in *Miller* and *Montgomery*—that a sentencer must undergo individualized sentencing, taking into account a juvenile offender's youth and its attendant characteristics before imposing LWOP on a juvenile—extends only to sentences imposed under mandatory sentencing schemes, or whether the rule is applicable anytime a juvenile will potentially serve LWOP, regardless of whether under a mandatory or discretionary sentencing scheme or by way of a plea agreement, so long as the offender had the "opportunity" to present mitigating circumstances.

[42] We briefly note other courts have recently considered the limits of *Miller* and *Montgomery*. Some courts have interpreted the scope of *Miller* and *Montgomery* broadly, holding proportionality requires individualized sentencing anytime a

court imposes an LWOP sentence, regardless of whether under a mandatory or discretionary sentencing scheme. *See Commonwealth v. Batts*, __ A.3d __, No. 45 MAP 2016, 2017 WL 2735411 at *18 (Pa. June 26, 2017) (finding, "in the absence of the sentencing court reaching a conclusion, supported by competent evidence, that the defendant will forever be incorrigible, without any hope for rehabilitation," a LWOP sentence is illegal); *Malvo v. Mathena,* __ F. Supp. 3d __*,* No. 2:13-CV-375, 2017 WL 2462188, at *3 (E.D. Va. May 26, 2017) (concluding "the rule announced in *Miller* applies to all situations in which juveniles receive a LWOP sentence," regardless of whether imposed under mandatory or discretionary sentencing schemes), *appeal docketed,* No. 17-6758 (4th Cir. Jun 14, 2017).

[43]   Other courts have construed *Miller* and *Montgomery* narrowly. For example, the Supreme Court of Virginia recently held *Miller* and *Montgomery* inapplicable where the Virginia sentencing scheme gave a juvenile offender the "opportunity" to present mitigating evidence at a hearing, but the offender agreed to the sentence through a plea bargain, forgoing the opportunity for the "certainty of a plea agreement." *See Jones v. Commonwealth*, 795 S.E.2d 705, 713 (Va. 2017), *petition for cert. filed,* (U.S., May 5, 2017) (No. 16-1337). In concluding *Miller* held that a judge or jury must merely have "the *opportunity* to consider mitigating circumstances before imposing the harshest possible penalty for juveniles,'" *id.* at 708, the Court expressly disagreed with the dissent's position that "*Montgomery* requires a *Miller* hearing . . . regardless of whether the sentence is mandatory or discretionary." *Id.* at 721.

[44] We hold the rule announced in *Miller* and *Montgomery* is not applicable to the narrow circumstance, such as here, where a juvenile defendant agrees to serve LWOP pursuant to a plea agreement that is accepted by a trial court. While the *Miller* court concluded, "a judge or jury must have the *opportunity* to consider mitigating circumstances before imposing the harshest possible penalty for juveniles," 567 U.S. at 489, 132 S. Ct. at 2475 (emphasis added), and the *Montgomery* court explained, "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence," 136 S. Ct. at 734, neither of those cases addresses the narrow circumstance at hand: Two parties agreeing the sentencing court—which would otherwise retain statutorily-provided discretion in imposing a sentence—would not have discretion at sentencing, because the sentence is provided in a plea agreement.

[45] "A plea agreement is contractual in nature, binding the defendant, the State, and the trial court." *Jackson v. State,* 968 N.E.2d 328, 332 (Ind. Ct. App. 2012). "Trial courts have discretion to accept or reject plea agreements." *Hunter v. State*, 60 N.E.3d 284, 288 (Ind. Ct. App. 2016) (citing *Pannarale v. State*, 638 N.E.2d 1247, 1248 (Ind. 1994)); Ind. Code § 35-35-3-3. However, once the trial court accepts a plea agreement, "it is strictly bound by its sentencing provision and is precluded from imposing any sentence other than required by the plea agreement." *Jackson,* 968 N.E.2d at 332.

[46] Here, Newton would have had an opportunity to present evidence of mitigating factors at his sentencing hearing prior to the court imposing the LWOP

sentence. *See* Ind. Code § 35-38-1-7.1 (1994). However, Newton chose to forego this opportunity, when he agreed to plead guilty for the certainty of serving LWOP instead of the possibility of a death sentence. We agree with the State that Newton's sentence here is not "mandatory" within the meaning of *Miller. See Jones,* at 795 S.E.2d at 711 ("Only where the General Assembly has prescribed a mandatory minimum sentence imposing an inflexible penalty has it divested trial judges of all discretion respecting punishment.").

[47] Even if we were to assume, in an abundance of caution, the rationale of *Miller* and *Montgomery* applies here, Newton nonetheless cannot demonstrate his sentence violates the Eighth Amendment because his sentencing court refused to accept his plea agreement calling for LWOP until it had given thorough consideration to whether the evidence demonstrated an LWOP sentence was proper for Newton.

[48] At the change of plea hearing on October 16, 1995, the trial court emphatically explained it was up to the court's discretion whether to accept the parties' plea agreement. First, the court thoroughly questioned Newton to ensure his understanding of the charges against him and the terms of the plea agreement. The court also specifically asked Newton's counsel whether there was "any reason to believe [Newton] did not understand the terms of the plea agreement," (Plea Hr'g Tr. at 36), whether there had been "some consultation with family members," (*id.* at 37), and whether Newton's counsel was "satisfied . . . [he] had sufficient time to discuss the matter with [Newton's] family and with [Newton]." (*Id.*) Finally, the court noted it would order a presentence

investigation report, review it, and "only after receiving and reviewing that report" the court would "decide whether or not to accept the plea agreement." (*Id.* at 40.) The court did note, however, if it accepted the plea agreement, it would be "bound to sentence [Newton] as the agreement provide[d]." (*Id.* at 41.)

[49] At the sentencing hearing, the trial court heard evidence on mitigating factors and specifically made findings regarding Newton's youth and his prospect of rehabilitation prior to accepting the plea agreement. Newton submitted a mitigation timeline. The trial court heard testimony from Peggy, Newton's mother, on Newton's troubled childhood and the instability of Newton's relationship with his father. Peggy testified in July 1994, roughly two months before Newton murdered Coyle, she moved homes with Newton's stepfather and told Newton he could no longer live with her. (Sent. Tr. at 37.) She testified Newton was sexually molested by a relative from roughly "first through the third grade." (*Id.* at 38.) She testified Newton was physically abused by his stepfather. (*Id.* at 42.) She also testified, at the age of twelve, Newton began running away from home and would sometimes be gone for "weeks at a time." (*Id.* at 43.) Peggy admitted that, on occasion, she encouraged this behavior, and testified when Newton would call home, she would "tell him not to come home that day." (*Id.* at 44.) Peggy testified Newton was involved with drug and alcohol counseling at a Youth Services Bureau, was on juvenile probation, and attended the Indiana Boys' School from roughly the ages of ten to twelve. The court also heard testimony from

Detective Paul Singleton, a police officer for the Muncie Police Department, and Scott, who was in the Fly Gang with Newton. Detective Singleton and Scott both testified about the Fly Gang's activities generally and about the specific events leading to the murder.

[50] After hearing evidence, the court asked counsel to present comments on issues that had formerly been taken under advisement, including "whether or not the submitted plea agreement should be accepted." (*Id*. at 96.) Newton's counsel urged the court to accept the plea agreement, citing mitigating circumstances that had "not been heretofore considered . . . that justif[ied] the plea agreement." (*Id*. at 104-05.) Both Newton's counsel and the prosecution made lengthy arguments encouraging the court to accept the plea agreement. After hearing testimony and comments from counsel, the court stated it would accept the plea agreement. The court said it would "incorporate all evidence offered on behalf of the Defendant up until now into the sentencing hearing along with [counsel's] comments previously made[.]" (*Id.* at 128.)

[51] Next, the court heard statements from Coyle's mother, brother, father, and girlfriend. Newton's counsel then made arguments on mitigating circumstances. Counsel argued "Newton's growth and development psychologically has affected his adult psychology and personality[,]" (*id.* at 174), his "criminal activity was caused by various psychological factors and alcohol-related factors that could be treated and would diminish with age," (*id.* at 176), that "at a very young age, [Newton] exhibited signs of mental or emotional disturbance that went untreated," (*id.* at 177), that, "if treated,

[Newton] can be productive in prison society," (*id.* at 177-78), and that Newton suffered from "serious personality disorders." (*Id.* at 178.) Lastly, counsel argued Duane "used [Newton]" and was "the man responsible" for the crime. (*Id.* at 181.) Yet still, counsel acknowledged "it does not mean that [Newton] should get anything less than life without parole." (*Id.* at 175.) After both sides presented arguments regarding mitigators and aggravators, the court gave Newton the opportunity to address the court before sentencing, but Newton declined the opportunity to do so.

[52] The court noted, "in support of its conclusion this was an intentional killing while committing criminal gang activity," (*id.* at 211), the court considered "evidence submitted at the change of plea hearing and today's [sentencing] hearing." (*Id.*) The court then stated:

> In any criminal sentence [the] Court considers, Mr. Newton, the risk as to whether or not you would commit other crimes, the nature and the circumstances of the crime that you have committed, your prior criminal record, if any, character and condition, whether or not the victim was less than 12 or at least 65 years of age, whether you violated any type of protective order. Court also considers any oral or written statements made by the victim of the crime. In this case the Court has considered all those factors.

(*Id.* at 212.)

[53] Although the court acknowledged "in his written plea agreement, [Newton] [had] admitted the existence of both aforementioned aggravators and further admitted that those aggravators outweigh[ed] potential mitigators," (*id.*), the

court was required to make a determination as to whether the aggravators outweighed the mitigators in sentencing Newton for confinement and conspiracy. The court then made the following comments about aggravating circumstances:

Court has considered and considered and considered the relative youth of this Defendant. Age is always considered in any sentencing hearing. It's particularly troubling that one so young can commit such a vicious and unprovoked attack. You had time in this case, Mr. Newton, to contemplate your actions. You had time to avoid inflicting any injury at all on Christopher Coyle. This was not a killing done during the heat of battle or during any type of confrontation. What you did, Mr. Newton, was you coldly and deliberately executed Christopher Coyle. When I see such a total disregard for human life at such a young age it is, as Mr. Arnold points out, both shocking and it is to me indicative that if placed in a similar situation as this, you would respond in a similar manner.

Secondly, the Court has considered whether or not this Defendant can be rehabilitated by incarceration in rehabilitative treatment. In assessing any person's chance at rehabilitation[,] the Court must look to the Defendant's past behavior. I also look, Mr. Newton, at what prior attempts at rehabilitation have been made. I consider whether or not a Defendant has voluntarily sought any rehabilitative treatment. In determining whether or not rehabilitation could be successful, it's especially difficult to make that kind of determination when you're dealing with a younger person. I don't see any evidence that you have made any voluntary effort at rehabilitation. In most of your prior actions, Mr. Newton, you have acted both impulsively and unfortunately without regard for harm to any other people. You have displayed total resistance to any type of authority, and you have continually demonstrated disdain for the justice system in

its entirety. This Court cannot conclude that rehabilitation is a strong possibility here in your case. Consequently[,] the Court cannot find this to be a mitigating circumstance.

\* \* \* \* \*

This process of alleging aggravating circumstances in a murder case enables society to identify and distinguish those most heinous type of murders. This is one.

Mr. Newton, this was the act of a coward. It was senseless and in a very real sense, as I pointed out, it was an execution. The tragedy is that the fact that this act is magnified by the fact that Christopher Coyle was minding his own business, he didn't cause you any trouble. The only reason he was on the street, as his father has pointed out, trying to get a friend home safely [sic]. This crime is aggravated even more by the impact it has had on our community and the community of Pendleton.

Court is also aware of the impact this had on our students in this community only trying to get an education, and as we heard today, trying not to live in fear. I don't think the students out there can ever feel the same about campus life.

You made a conscious choice and a deliberate choice, and you made the choice to kill Christopher Coyle. When you made that choice, Mr. Newton, it seems to me that you have forfeited your right to be a part of our society. It seems to me this is precisely the kind of case the legislature had in mind when the life without parole statute was passed. Frankly[,] society should not have to put up with people like Mr. Newton.

From what I've heard today and what I heard the last time we were in Court, Mr. Newton, it seems to me you were a bomb

> waiting to explode. To lead a person into an alley and to put a
> bullet in his head and leave him there to die in the dirt takes a
> very different kind of person. It seems to the Court it takes a
> person filled with hate, and a person who is genuinely evil, and
> in my opinion, Mr. Newton, beyond rehabilitation.

(*Id*. at 220-25.)

[54] The court then noted it found as mitigating circumstances Newton's age of seventeen at the time of the crimes, that the crimes were Newton's first felony convictions, and that Newton had "a strong family support group." (*Id*. at 225.) The court also noted Newton "had been subjected to a dysfunctional family," "poor parenting," abuse, and a "lack of proper discipline." (*Id*.) However, the court noted these mitigating circumstances were "slight" in comparison to the aggravating factors. (*Id.* at 225-26.)

[55] After discussing the mitigating and aggravating circumstances, the court stated: "The issue still remains, Mr. Newton, as to whether or not life imprisonment without the possibility of parole [is] an appropriate punishment. Court concludes that it is an appropriate punishment." (*Id.* at 226.) The court supported this conclusion by stating: "This was a thrill killing, this act was totally random, it was unprovoked, and it was senseless. It was also savage. Anyone who would commit such an act has stepped outside the bounds of civilized society and should not be welcomed back." (*Id.*) The court noted Newton "demonstrated absolutely no regard for the consequences of any of [his] actions," (*id*. at 227), "demonstrated no regard for human life," (*id*.), "the risk that [Newton] would kill again is too great," (*id*.), and that it was "a risk

this community should not have to take." (*Id.*) The court concluded "the only appropriate penalty for the offense of murder as alleged is a sentence of life imprisonment without parole." (*Id.*)

[56] Thus, in determining whether to accept the sentence of LWOP as punishment for Newton, the trial court underwent the very considerations the U.S. Supreme Court prescribed seventeen years later in *Miller* and twenty years later in *Montgomery*. The trial court explicitly made determinations, based on evidence, regarding Newton's youth and its attendant characteristics, yet still reached the conclusion Newton should never be given the opportunity for parole. We note the U.S. Supreme Court was reluctant to impose a strict procedural requirement on courts in sentencing, such as requiring trial courts "to make a finding of fact regarding a child's incorrigibility." *See Montgomery*, 136 S. Ct. at 735 ("When a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems."). Nevertheless, because the trial court did in fact explicitly make those determinations here, we hold Newton's sentence was safeguarded against any possibility it violated the Eighth Amendment of the Constitution. *See id.* (holding a sentencing hearing "does not replace but rather gives effect to *Miller*'s substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity").

[57] Furthermore, to the extent Newton can now show he has rehabilitated himself while in prison, this does not render his sentence unconstitutional. The *Miller*

and *Montgomery* holdings require "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors to separate those juveniles who may be sentenced to life without parole from those who may not." 136 S. Ct. at 735. Implicit in this holding is the notion that the individualized determination, taking into account the prospect of rehabilitation, is made *at the time of sentencing.* In *Montgomery*, the U.S. Supreme Court remanded Montgomery's case for resentencing because Montgomery was never given the opportunity to present evidence that his crime did not reflect irreparable corruption. However, here, unlike in *Montgomery*, Newton was given the opportunity at sentencing to present evidence of his prospect for rehabilitation. Because the trial court heard that evidence and made the individualized determination at the sentencing hearing, it is irrelevant whether Newton has in fact made progress towards rehabilitating himself while in prison.[12]

---

[12]We also note Newton's claim on appeal that the successive post-conviction court erred in excluding certain evidence he submitted of his rehabilitation in prison. At the post-conviction hearing, Newton offered multiple exhibits as evidence of his participation in the Shakespeare for Offenders program in the Special Confinement Unit at Wabash Correctional Facility. The post-conviction court heard expert testimony from James E. Aiken, a consultant in prison security management, regarding Newton's rehabilitation in prison. The trial court excluded other evidence, including workbooks Newton wrote in the Shakespeare for Offenders program, and letters written to Newton from various individuals who were positively influenced by Newton's work.

Newton argues the excluded evidence showed his successful involvement in a prison program and that this evidence was relevant to show his crime "was the product of transient youth rather than irreparable corruption." (Appellant's Br. at 48.) However, we hold Newton's sentence is not unconstitutional because the trial court complied with the procedural safeguards mandated by *Miller* and *Montgomery* before imposing LWOP on Newton. As the evidence Newton sought to admit would not have been available to the sentencing court, we cannot find the post-conviction court erred in excluding irrelevant evidence. *See Barnhart v. State,* 15 N.E.3d 138, 143 (Ind. Ct. App. 2014) ("Errors in the admission or exclusion of evidence are to be disregarded as harmless error unless they affect the substantial rights of a party.").

[58] We acknowledge the *Montgomery* court's cautioning that "*Miller's* conclusion that the sentence of life without parole is disproportionate for the vast majority of juvenile offenders raises a grave risk that many are being held in violation of the Constitution." 132 S. Ct. at 736. To this point, we reiterate, as our Indiana Supreme Court did in *Conley,* that Newton is only one of four juveniles to have ever been sentenced to LWOP in Indiana. *See Conley,* 972 N.E.2d at 880 (noting Andrew Conley was the fourth juvenile sentenced to LWOP after Larry Newton in 1995, Daniel Boyd in 1997, Greg Dickins in 2001). We believe this serves as further evidence that Indiana indeed has historically exercised a policy of reserving LWOP for use "in only the most heinous of crimes." *Id*. at 880.

[59] The U.S. Supreme Court did not categorically bar LWOP for juveniles, but instead effectively carved out an exception, allowing LWOP for "the rarest of juvenile offenders." 132 S. Ct. at 734. Because Newton's sentencing court gave extensive consideration to whether LWOP was appropriate for Newton and, in the process, explicitly found Newton was "beyond rehabilitation," (Sent. Tr. at 225), even if Newton had not waived his Eighth Amendment right by signing a plea agreement that called for LWOP sentencing, we could not say the imposition of LWOP violated his Eighth Amendment right to be free of cruel and unusual punishment.[13]

---

[13] Newton also claims that his sentence is inappropriate and he was denied the right to effective assistance of counsel under the Sixth Amendment of the United States Constitution. Both of these claims are procedurally barred.

# Conclusion

[60] We hold the mandate of *Miller* and *Montgomery* does not apply to the narrow circumstance, such as here, where a juvenile defendant voluntarily enters into a plea agreement to serve LWOP. Even so, in determining whether to accept the plea agreement, the trial court complied with the procedural safeguards contemplated by *Miller* and *Montgomery.* These safeguards ensured Newton does not fit within the "vast majority of juvenile offenders" for whom a sentence of LWOP is disproportionate. Newton's sentence of LWOP is thus not unconstitutional under the Eighth Amendment of the United States Constitution. Accordingly, we affirm the judgment of the successive post-conviction court.

[61] Affirmed.

Brown, J., and Pyle, J., concur.

---

Newton raises the issue of ineffective assistance of counsel in his Appellant's Brief. Newton raised this claim in his prior post-conviction petition, and that post-conviction court found Newton's counsel were effective. This claim is thus barred by the doctrine of *res judicata. See Matheney,* 834 N.E.2d at 662 (claims that have already been decided adversely are barred from re-litigation in successive post-conviction proceedings by the doctrine of *res judicata*).

Similarly, Newton's claim that his sentence is inappropriate was available to him in his prior petition for post-conviction relief, but he failed to raise it. Thus, this claim too, is barred. *See id.* ("Claims that could have been, but were not, raised in earlier proceedings and otherwise were not properly preserved are procedurally defaulted; we do not authorize the filing of successive petitions raising forfeited claims.").